MARY MORROW v. ST. PAUL CITY RAILWAY COMPANY.[1]

January 26, 1898.

Nos. 10,808—(240).

Street Railway—Injury to Employee—Incompetency of Fellow Servant—Notice to Employer—Sufficiency of Evidence.

Evidence considered, and *held*, that it was sufficient to take the case to the jury upon the issue as to the incompetency of the defendant's gripman, and whether it had notice thereof prior to the accident here in question.

Appeal by plaintiff as administratrix of the estate of George Morrow, deceased, from an order of the district court for Ramsey county, Bunn, J., denying her motion for a new trial after a verdict for defendant by direction of the court. Reversed.

*C. D. & Thomas D. O'Brien,* for appellant.

*Munn & Thygeson,* for respondent.

START, C. J.

The plaintiff's intestate, George Morrow, was injured by a collision between an electric and cable car of the defendant on March 22, 1895, and died two days thereafter as the result of his injuries. This action was brought to recover the damages which the widow and next of kin sustained by his death. When the plaintiff rested, the trial court, on motion of the defendant, instructed the jury to return a verdict for the defendant, and the plaintiff appealed from an order denying her motion for a new trial. This case was here on a former appeal. 65 Minn. 382, 67 N. W. 1002.

At and prior to the time Morrow was injured the defendant operated an electric railway, on which Morrow was a conductor, from Merriam Park east to Milton street in the city of St. Paul,

[1] Reported in 73 N. W. 973.

where it connected with defendant's cable railway, which ran thence east to Broadway street. The electric cars would arrive at Milton street on the south track and the cable cars on the north track, and the former would be switched to the north track and the latter to the south track for the return trips respectively. The rules of the defendant required that the conductor of the electric car, while making the switch, should be upon the ground, in the rear of his car, holding the trolley rope, for the purpose of transferring the trolley from the wire on the south track to the one on the north track, there being no cross wires. There was also a rule then in force to the effect that the cable cars should remain stationary on the north track until the electric car had made the switch, and passed beyond it.

At the time of the accident the electric car was being switched from the south to the north track, and Morrow was standing on the ground in the act of transferring the trolley from one wire to the other, in the discharge of his duty, when the cable train, upon which Seth Colbeth was the gripman, started forward, and collided with the electric car, and Morrow was caught between the bumpers, and so injured as to cause his death. There seems to be no controversy in this case that Morrow was not, but that Colbeth was, guilty of negligence, in the premises.

The complaint charges that the cable was defective, and that the gripman operating the cable train was, to the knowledge of the defendant, incompetent. If the evidence upon either of these claims was such as to take the case to the jury, the trial court erred in directing a verdict and in denying the motion for a new trial. The order denying the motion does not recite the grounds upon which it was made, and the notice of motion is not made a part of the record; hence the defendant urges that the order is to be treated as a pro forma one, which will not be reviewed on appeal therefrom. The order cannot be so construed, and the appeal presents for our decision the question whether, upon the whole evidence, the defendant was, as a matter of law, entitled to a verdict upon both issues.

The evidence tending to show any remediable defects in the cable was very slight, and there was no evidence to support a find-

ing that any defect, real or supposed, in the cable was the proximate cause of the injury sustained by Morrow.

As to the other issues the trial court was of the opinion

"That there was not sufficient evidence to go to the jury on the question of the knowledge of defendant of the incompetency of the gripman, Colbeth, at the time of the accident, if he was incompetent, as the nature of the accident would indicate."

We are of the opinion that there was. The burden of showing the incompetency of the gripman was clearly upon the plaintiff, and we shall assume, for the purposes of this appeal, that the burden of showing notice to the defendant of such incompetency was also on the plaintiff, although the evidence tends to show that the gripman was incompetent not only at the time of the accident, but also at the time he was employed. When the unfitness of the servant is shown to have existed at the time of his employment, a prima facie case of negligence is made out against the master, and the burden is upon him to disprove the negligence. Crandall v. McIlrath, 24 Minn. 127. In the case cited the negligence charged was the act of employing an incompetent servant, but in this case it is not charged that the defendant was guilty of negligence in taking the gripman in question into its service. The evidence as to his incompetency was clearly such as to require the submission of this issue to the jury.

We shall not refer particularly to the evidence on this point, but in a general way only, in connection with the evidence on the question of notice to the defendant. Whether the defendant had notice of the incompetency of the gripman was a matter peculiarly within its own knowledge; and, further, if such incompetency existed at the time he was employed by the defendant, such fact would be an important item of evidence on the question of notice. These suggestions must be kept in mind in considering the evidence.

The gripman, Colbeth, was, prior to his employment by the defendant, a farmer, unused to machinery, and was given instructions and examined by the defendant's foreman, George J. Burns, as to the duties of a gripman. It was the duty of Burns so to instruct and examine applicants for employment, and to report as to their qualifications to the superintendent; and if, after their employ-

ment, he had reason to change his opinion, so to report to the superintendent. On August 21, 1894, he reported Colbeth competent as a gripman, rating him 85 per cent., and he was employed, and placed on the extra list as an extra man. Four days after this an accident occurred, whereby the cable was cut by Colbeth's forgetting to open his grip when he came to the cut-off at the power house. This accident was reported to the superintendent by Burns, who testified as follows:

"Now, I notice that in this slip or report of yours to Mr. Smith with regard to Colbeth, you turned him in as, 'Gripman, O. K.' A. Yes, sir. Q. '——, the bearer is O. K?' A. Yes, sir. Q. Did you ever change your opinion upon that point? A. Well, I might have changed my opinion after he got to running as a regular man,—while he was running as an extra man,—and still I might change my opinion after he got to be a regular man. Q. Did you change your opinion? A. I did, after that report was made out, so far as his running on the cable was concerned, at the time of that accident; yes, sir. Q. Did you notify Mr. Smith of your change of opinion? A. Well, I made a written report of that,—that case that occurred at that time. Q. You notified Mr. Smith? A. Yes, sir. Q. Mr. Smith told you that you would give him another chance, anyway, didn't he? A. Well, I think that is customary. Q. Well, didn't Mr. Smith say that 'we'll give him another chance?' A. Well, I wouldn't swear he did. Q. Didn't you recommend the man's discharge? A. Well, I don't think I did decidedly recommend his discharge. Q. Now, I don't want to make this unpleasant for you, but you made that report, in which you recommended him to Mr. Smith. You were charged by that company with the duty of examining the men, and saying when they were competent? A. Yes, sir. Q. And you also considered it to be your duty, if you changed your mind with regard to a man, to say that? A. Well, I certainly did. If there was anything that occurred in the meantime, I would certainly report. Q. You did change your mind about Colbeth, and did so notify the company? A. I did; yes, sir."

On his recross and redirect examination he further testified thus:

"Q. You discovered the fact that after he had been running [running after this accident] he got to be a capable and competent man,—after that? A. He was a good man on the extension. No question about that. Q. I mean, was he a good man on the cable also? A. I never had any fault to find with him when he was running any trips afterwards. Q. He never had any other accidents with the cable than this one, did he? A. No, sir; he did not. Q. You say you found him a good man on the extension? A. He

was a good man.   Q. That is on the electric cars?   A. Yes, sir.   Q. Within a few days after he started to perform the duties of grip-man, he cut the rope?   A. Yes, sir.   Q. Can that be done except by either negligence or incompetency?   A. Oh, yes, we have got good men that do it.   Old men do it, too.   Q. How did this man do it?   A. He forgot to open his grip.   Q. Forgot to open his grip when he came to the cut-off?   A. Yes, sir; that is the way it happened."

Colbeth was at no time a regular gripman, but was employed most of the time as a motorman on the extension, or electric line, and was ordered to take extra cable trains, as gripman, as occasion might require.   The evidence tends to show that he made in all about fifty trips on the cable trains from the commencement of his service to the date of Morrow's injury.   It also tends to show that he was nervous, and liable to lose his presence of mind in an emergency; and, further, there was evidence tending to show that his general reputation was that he was incompetent.   The evidence discloses other minor facts and circumstances which, standing alone, would be of little probative force on this question of notice, but, in connection with the rest of the testimony, they are entitled to consideration.

We are of the opinion that the evidence fairly shifted the burden as to defendant's notice of the incompetency of the gripman to it. It is true that a single act of negligence on the part of a servant who has previously shown himself competent and careful is not sufficient per se to charge the master with liability for retaining him in his service.   But such is not this case, for the evidence tends to show that this gripman never was competent, and that, after the first accident, the defendant's foreman, in the line of his duty, so reported in effect to its superintendent.   It was upon the report of this foreman that this gripman was employed, and shortly there-after he again reported that he had changed his mind as to the gripman's competency.   Surely, it was a question for the jury, if they found such to be the facts, to determine whether the defendant acted with reasonable care and caution in retaining Colbeth in its employment as a gripman, in view of the fact that upon the compe-tency and fidelity of the gripman human lives depend.

Order reversed, and a new trial granted.